**CARLSON LYNCH, LLP**
Todd D. Carpenter (CA 234464)
Scott G. Braden (CA 305051)
1350 Columbia St., Ste. 603
San Diego, California 92101
Telephone: 619.762.1900
Facsimile: 619.756.6991
tcarpenter@carlsonlynch.com
sbraden@@carlsonlynch.com

*Attorneys for Plaintiff and*
*Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTEN SCHERTZER, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAMSONITE COMPANY STORES, LLC, an Indiana Limited Liability Company, and DOES 1-100, inclusive,<br><br>Defendant. | Case No. 3:19-cv-00639-JSL-MSB<br><br>**FIRST AMENDED COMPLAINT**<br><br>1.   **Violation of California's Unfair Competition Laws ("UCL"); Cal. Bus. & Pro. Code §§ 17200, *et seq.***<br><br>2.   **Violation of California's False Advertising Laws ("FAL"); Cal. Bus. & Prof. Code §§ 17500, *et seq.***<br><br>3.   **Violations of California Consumer Legal Remedies Act ("CLRA"); Cal. Civ. Code §§ 1750, *et seq.***<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Kristen Schertzer ("Plaintiff") brings this First Amended Complaint ("FAC"), on behalf of herself and all others similarly situated, against Defendant Samsonite Company Stores, LLC ("Samsonite" or "Defendant"), and states:

## NATURE OF THE ACTION

1.      This class action seeks monetary damages, restitution, declaratory and injunctive relief from Defendant arising from its deceptive business practice of advertising false reference prices and corresponding phantom discounts on Samsonite luggage and travel accessory merchandise in its California outlet stores.   Specifically, Samsonite advertises fictitious references to "OUR PRICE" prices in order to produce phantom "NOW" price discounts on its outlet merchandise.[1]  The "OUR PRICE" price represents to consumers the merchandise's regular, or former, price and the "NOW" price represents to consumers a significant discount or savings from the regular, "OUR PRICE" price. Plaintiff brings this action on behalf of herself and all others in the state of California who, during the relevant time period, purchased from a Samsonite outlet store merchandise marked with a deceptive reference price.

2.      This FAC is offered to cure concerns the Court identified in its Order Granting Defendant's Motion to Dismiss Plaintiff's Complaint.  ECF No. 13.  First, the FAC provides additional facts regarding the depth and scope of Plaintiff's counsel's investigation into Defendant's scheme, including items tracked and the dates and frequency of tracking.   Second, the FAC provides additional allegations and factual support as to how and why Defendant's "OUR PRICE" / "NOW PRICE" juxtaposition misleads consumers, including Plaintiff, into believing Defendant's "OUR PRICE" price advertisements represent bona fide former prices.  Third, the FAC provides additional factual allegations supporting Plaintiff's standing to seek injunctive relief, which also demonstrate the inadequacy of any available legal remedy.  Finally, this FAC provides additional information regarding how and why false reference pricing schemes deceive consumers, including Plaintiff, in the form of academic literature.

---

[1] *See* Exhibit A, photographs of in-store pricing placards.

FIRST AMENDED COMPLAINT

3.     The practice of false reference pricing occurs when a retailer fabricates a fake regular, original, and/or former reference price, and then offers an item for sale at a deeply "discounted" price.   The result is a sham price disparity that misleads consumers into believing they are receiving a good deal and induces them into making a purchase.   In reality, the practice artificially inflates the true market price for these items by raising consumers' internal reference price, and therefore the value and demand, ascribed to these products by consumers.   Retailers drastically benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions.   The information available to consumers varies for different types of products,[2] but consumers frequently lack full information about a product and, as a result, can incorporate information from sellers to make purchase decisions.[3]

4.     Defendant engages in a false and misleading reference price scheme in the marketing and selling of its outlet merchandise.   Defendant's advertised false reference prices are thus incorporated into the consumer's decision process.   First, a product's "price is also used as an indicator of product quality."[4]   In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality.   Second,

---

[2] Even within a product, consumers may have imperfect information on the individual attributes.   Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16 no. 1 (1973): 67-88, pp. 68-69.

[3] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-329, pp. 311-312.

[4] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. Also see Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

reference prices "appeal[] to consumers' desire for bargains or deals."[5]   Consumer psychologists note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved" and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[6]   Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[7]

5.     Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[8]   Internal reference prices are "prices stored in memory" (*e.g.*, a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (*e.g.*, a "suggested retail price," or other comparative sale price).[9]   Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[10]   For infrequently

---

[5] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 52.

[6] Darke, Peter and Darren Dahl. "Fairness and Discounts: The Subjective Value of a Bargain." *Journal of Consumer Psychology* 13, no 3 (2003): 328-338, p. 328.

[7] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'".   Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205.

[8] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

[9] Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 62.

[10] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust empirical evidence that external reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

---

purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[11]   In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[12] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[13] and at least one publication has summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][14]

6.      The California legislature and federal regulators recognize the harm attendant to false reference pricing schemes and prohibit the practice.   The law recognizes the reality that consumers often purchase merchandise marketed as being "on sale" purely because the advertised discount seemed too good to pass up.   Accordingly, retailers have an incentive to lie to customers and advertise false sales.   The resulting harm is tangible—the bargain hunter's expectations about the product he purchased is that it has a higher perceived value and he may not have purchased the product but for the false savings.   As the Ninth Circuit recognized in *Hinojos*, misleading reference prices effect an economic injury "because the bargain hunter's expectations about the product he just purchased is

---

[11] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 212.

[12] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[13] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161.

[14] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

precisely that it has a higher perceived value and therefore has a higher resale value." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013).

7.    This practice is not accidental.  Rather, this practice is a fraudulent scheme intended to deceive consumers into: (1) making purchases they otherwise would not have made; and/or (2) paying substantially more for merchandise consumers believed was heavily discounted and, thus, worth more than its actual value.

8.    Retailers, including Defendant, understand that consumers are susceptible to a good bargain, and therefore, Defendant has a substantial motivation to deceive in order to generate sales.  A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.  In this case, Defendant has marked its outlet merchandise with a reference "OUR PRICE" price which conveys to consumers, including to Plaintiff, "the product's worth and the prestige that ownership of the product conveys."  *Hinojos*, 718 F.3d at 1106 (citing Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").  "Misinformation about a product's 'normal' price is…significant to many consumers in the same way as a false product label would be." *Hinojos*, 718 F.3d at 1106.

9.    Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant has violated, and continues to violate, California and federal law which prohibits the advertisement of goods for sale as discounted from former prices that are false and which prohibits the dissemination of misleading statements about the existence and amount of price reductions.  Specifically, Defendant has violated, and continues to violate: California's Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Business & Professions Code §§ 17500, *et seq.* (the "FAL"); the California Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq.* (the "CLRA"); and the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices

in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

10. Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more Samsonite branded products from a Samsonite outlet store in California that was deceptively represented as discounted from a false advertised reference price. Plaintiff seeks to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendant from further use of false and misleading representations regarding former price comparisons in its labeling and advertising. Further, Plaintiff seeks to obtain damages, restitution, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

11. Finally, Plaintiff seeks reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorneys' fees.

## **JURISDICTION AND VENUE**

12. This Court has original jurisdiction of this Action pursuant to the Class Action Fairness Act, 28 U.S.C § 1332 (d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class have a different citizenship from Samsonite.

13. The Southern District of California has personal jurisdiction over Samsonite because Samsonite is a corporation or other business entity authorized to conduct and does conduct business in the State of California. Samsonite is registered with the California Secretary of State to do sufficient business with sufficient minimum contacts in

California, and/or otherwise intentionally avails itself of the California market through the ownership and operation of its outlet store in California.

14.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Samsonite transacts substantial business in this District.   A substantial part of the events giving rise to Plaintiff's claims arose here.

## PARTIES

A.   **Plaintiff's Experience**

15.    Plaintiff Kristen Schertzer resides in San Diego County, California.  Plaintiff, in reliance on Samsonite's false and deceptive advertising, marketing, and discount pricing scheme, purchased a Samsonite On Air 3 Hardside Spinner 20" (the "Suitcase") for $167.99, exclusive of tax, from the Samsonite outlet store located at the Carlsbad Premium Outlets at 5620 Paseo Del Norte, Carlsbad, CA 92008, on October 18, 2018. While shopping at the Samsonite outlet store, Plaintiff examined several pieces of luggage within the store.   As she shopped, she noticed in-store signage throughout the store representing that items, including the Suitcase Plaintiff purchased, were discounted.  The signs typically stated "Take __% off OUR PRICE" and depicted corresponding "NOW" prices. *See, e.g.*, Exhibit A.  The Suitcase Plaintiff purchased was advertised through its price tag as having a reference "OUR PRICE" price of $280.00.   Additional in-store signage also advertised the Suitcase on sale as "Take 40% off OUR PRICE" and set forth a "NOW" price of $167.99.

16.    Plaintiff believed the higher "OUR PRICE" price was an actual and legitimate price at which Defendant had previously sold the Suitcase.  Plaintiff did not observe any other signage dispelling her impression that the Suitcase's "NOW" price represented a legitimate discount.  Had she known the "OUR PRICE" price was fictitious, and that Defendant never sold the Suitcase at that price, she would not have purchased the suitcase or would have paid less for the item.  The phrases "OUR PRICE" and "NOW" indicated to Plaintiff that the Samsonite outlet store formerly sold the Suitcase at $280.00 and that it was being offered "NOW" and for a limited time, at $167.99.

17.     After observing the price tag on the Suitcase and the accompanying signage, Plaintiff believed she was receiving a significant discount on the item.  Because she liked the Suitcase, and felt that the discounted price would likely not last, she proceeded to purchase the Suitcase.

18.     However, as informed by Plaintiff's counsel's investigation discussed below, Plaintiff alleges the Suitcase was never offered for sale at its original "OUR PRICE" in Defendant's outlet stores, nor was it offered for sale at its advertised "OUR PRICE" within the 90-day period immediately preceding Plaintiff's purchase.

19.     Neither Plaintiff's receipt, in-store signage, nor price tag information indicated to Plaintiff that the Suitcase was not offered previously at the advertised reference price or when it was last offered at the advertised reference price.  In fact, nothing in the outlet store Plaintiff visited disclosed how Defendant came up with the reference "OUR PRICE" price.

**B.     Defendant**

20.     Defendant Samsonite Company Stores, LLC is an Indiana limited liability company, with its principal executive offices in Mansfield, Massachusetts.  It operates as a subsidiary of Samsonite International S.A.  Defendant designs, manufactures, advertises, markets, distributes, and/or sells travel luggage and accessories to hundreds of thousands of consumers in California and throughout the United States.

21.     Plaintiff does not know the true names and capacities of the persons or entities sued herein as DOES 1-100, inclusive, and therefore sues such defendants by such fictitious names.  Plaintiff is informed and believes, and upon such information and belief alleges, that each of the DOE defendants is in some manner legally responsible for the damages suffered by Plaintiff and the Class (defined below) members as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

# FACTUAL BACKGROUND

## A.   Defendant's False Discounting Scheme

22.     Samsonite is a travel luggage retailer, selling products such as luggage, business bags, backpacks and duffels, and travel accessories.  Samsonite operates over 100 stores in the United States, including approximately 14 outlet stores in California. Samsonite sells a variety of travel baggage and accessories from its own name brand at its retail and outlet stores, as well at various authorized retailers such as JC Penney, Macy's, and Kohl's.   This case involves only the Samsonite branded merchandise sold by Defendant at its Samsonite outlet store locations.

23.     Samsonite's scheme involves perpetually discounting its Samsonite merchandise in its outlet stores.  The scheme is effectuated as follows: each piece of Samsonite branded merchandise sold in Samsonite's outlet stores is advertised with two prices: the "OUR PRICE" price, representing a false advertised reference price, and a "NOW" price, representing a large markdown, and thus savings, from the purported reference price.  The two prices ("OUR PRICE" and "NOW") are conveyed to consumers via in-store signage, as exemplified in Exhibit A.

24.     However, at no time are the Samsonite products sold in the outlet stores ever offered for sale at the "OUR PRICE" price.  The "OUR PRICE" price is merely a false reference price which Defendant utilizes exclusively as a benchmark to manufacture deeply discounted "NOW" prices on the Samsonite branded merchandise sold in its outlet stores during the Class Period (defined below).  Defendant's scheme has the effect of tricking consumers into believing they are getting a significant deal by purchasing merchandise at a steep discount, when, in reality, consumers are paying for merchandise at its usual price.  Defendant's deceptive pricing scheme further artificially raises the prices actually paid by consumers by creating the false impression of a bargain and thereby artificially and fraudulently raising demand for the merchandise.

25.     This misinformation communicates to consumers, including Plaintiff, that the Samsonite branded products have a greater value than the advertised "NOW" price.  As

the Ninth Circuit recognizes, "[m]isinformation about a product's 'normal' price is…significant to many consumers in the same way as a false product label would be." *See Hinojos*, 718 F.3d at 1106.

26.     Additionally, Samsonite's scheme is unique with respect to the terms it employs. "OUR PRICE" reasonably conveys to consumers, including Plaintiff, that the advertised reference price was a price at which the *Samsonite outlet* (hence, "OUR") actually offered and sold the product. This reasonable belief is further enforced by Samsonite's employment of the temporal term "NOW", which reasonably conveys to consumers, including Plaintiff, that the purported discount represents a present and limited reduction in the price of merchandise from its former selling price (hence, "NOW").[15]

27.     Indeed, Defendant's unique use of the word "NOW" reasonably implies a sense of urgency to consumers that the "deal" advertised will be for a limited time. Thus, Defendant's advertised reference "OUR PRICE" prices induce consumers into believing that the merchandise was once sold at the higher reference price and will be again if the consumer does not make a purchase "NOW".

28.     Nowhere in Defendant's outlet stores does Defendant disclose that the reference prices used are not former prices. The omission of this disclosure, coupled with Defendant's use of fictitious advertised reference prices, renders Defendant's outlet pricing inherently misleading. Nor are consumers made aware of what Defendant means by the "OUR PRICE" price references so as to dispel consumers' reasonable impression that the advertised reference "OUR PRICE" prices represent bona fide former prices.

29.     Defendant engages in this practice knowing full well that the advertised products are never actually offered or sold at the advertised reference "OUR PRICE" prices in order to facilitate sham markdowns. The only plausible explanation for this

---

[15] Regardless of whether a product sold in the outlet store is manufactured and sold exclusively at the outlet store or is also available at Samsonite's mainline retail stores or elsewhere, the language "OUR PRICE" and "NOW" price reasonably communicates to Plaintiff that the "OUR" (i.e., Samsonite's) price was a former price at which the merchandise was sold at the outlet store and the "NOW" price represents a discount from the respective former price.

practice is to drive sales[16] and artificially inflate the price at which consumers are willing to buy Defendant's products.[17]   Defendant thus increases sales of the Samsonite outlet merchandise by creating the illusion of traditional bargains in offering merchandise at prices reduced from fabricated, arbitrary, and false original prices, thereby deceiving its customers into believing they are getting a substantial bargain.

30.   Moreover, Defendant's advertised discounts were/are fictitious because the reference "OUR PRICE" prices did not represent a *bona fide* price at which Defendant previously sold a substantial quantity of its products for a reasonable period of time as required by the Federal Trade Commission ("FTC").   In addition, the represented advertised reference prices were not the prevailing market retail price within the three months immediately preceding the publication of the advertised former reference price, as required by California law.

31.   Thus, Defendant's perpetual discounting scheme constitutes false, fraudulent, and deceptive advertising.

## B.   Investigation

32.   Plaintiff's counsel has investigated dozens of retailers to determine whether they are engaged in fraudulent sale discounting.   Plaintiff's counsel's investigation of Samsonite outlet stores included the 90-day period immediately preceding Plaintiff's purchase and several months thereafter.   To be clear, Plaintiff's counsel was investigating Samsonite's sale discounting practices well before Plaintiff made a purchase at Samsonite and well before Plaintiff's counsel began representing Plaintiff in this matter.

---

[16] "By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product." Grewal, Dhruv, and Larry D. Compeau, "Comparative Price Advertising: Informative or Deceptive?" *Journal of Public Policy & Marketing* 11, no. 1 (1992): 52-62, at p. 55.

[17] "[C]onsumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." Gotlieb, Jerry B. and Cyndy Thomas Fitzgerald, "An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product," *Journal of Applied Business Research* 6, no. 1 (1990): 59-69, at p. 66.

33.   Plaintiff's counsel's investigation of Samsonite revealed that Samsonite outlet store merchandise is priced uniformly.   That is, Samsonite merchandise sold at Samsonite's outlet stores bears a price tag with a false reference "OUR PRICE" price and a substantially discounted "NOW" price.

34.   Plaintiff's counsel's investigation included cataloging the Samsonite product prices at Samsonite outlet stores in San Diego County, including at the Carlsbad Premium Outlets at 5620 Paseo Del Norte, Carlsbad, CA 92008 and the Las Americas Premium Outlets 4265 Camino De La Plaza, San Diego, CA 92173, for several months before and after Plaintiff's purchase.[18]   The false "OUR PRICE" price and corresponding purported "NOW" price pricing scheme was both uniform and identical at all stores investigated.   At no time during the investigation was any item tracked offered for sale at its advertised "OUR PRICE" price.

35.   From approximately August 7, 2018 through February 7, 2019, Plaintiff's counsel's investigation included tracking the following products at both the Carlsbad and Las Americas Samsonite outlets:

| Product | Advertised "OUR PRICE" | Purported Discount Observed During Investigation |
|---|---|---|
| On Air 2 Hardside | $260.00 | 40-60% Off |
| Tru-Frame | $470.00 | 40-50% |
| Tru-Frame 20" | $500.00 | 40-50% |
| Chronolite | $600.00 | 30-50% |
| Chronolite Spinner 20" | $500.00 | 30-50% |
| Firelight | $600.00 | 30-50% |
| Outline X | $500.00 | 40-50% |
| Ellipse Lite | $310.00 | 40-50% |
| Stryde Carry-On Glider | $310.00 | 40-50% |
| Stryde | Various[19] | 50% |

[18] The next closest Samsonite outlet store is located at the Citadel Outlets in Los Angeles, approximately 117 miles away.

[19] Stryde is a Samsonite luggage product line with various models.   As shown in in the pricing chart in Exhibit A, p. 1, the "OUR PRCE" for each model of the Stryde is

12

36.     Counsel's investigation consisted of approximately 46 visits to both the Carlsbad and Las Americas Samsonite outlet during the aforementioned time period, with most being no more than a week, and in many cases only a few days, apart.  The "OUR PRICE" and corresponding "___%" (resulting in the "discounted" "NOW" price) appeared identical between the two outlet stores investigated across every visit.  In other words, the purported discounts on each product were the same at both the Carlsbad and Las Americas outlets on any given day.

37.     The investigation at the Carlsbad and Las Americas outlets revealed that Samsonite's advertised reference "OUR PRICE" prices were false and corresponding discount price scheme was both uniform and identical on the merchandise observed at that location.  Numerous signs located throughout the store indicated a "___% Off" the "OUR PRICE" reference prices on the price tags of the corresponding products.  The practice appeared uniform throughout the stores.  The only thing that changed was the requisite "___% Off "on certain merchandise items.

38.     While counsel's investigation did not catalogue every single piece of luggage for sale at the Samsonite outlets, most, if not all, items in the stores appeared to be offered at a "___% Off".  Nothing in the store distinguished between made-for-outlet and clearance merchandise or when the advertised reference prices were last actually used, if ever.  Thus, counsel's investigation into the Carlsbad and Las Americas Samsonite outlet stores supported the conclusion that Samsonite's false reference pricing scheme is uniform throughout its California outlets, such that it applies to all Samsonite branded products sold in every California Samsonite outlet store, including the Suitcase purchased by Plaintiff on October 18, 2018.

39.     Plaintiff's counsel's investigation further could not locate on any of Defendant's outlet price tags or in other outlet advertising anything indicating that the advertised reference prices were not the prices at which items were formerly offered by

uniformly discounted at 50% off.   These pricing charts were pervasive throughout Defendant's outlet stores investigated.

the outlet store.  Indeed, Plaintiff's counsel investigated, but could not locate anywhere on Defendant's price tags or in-store, any disclosure as to how Defendant determined the advertised reference prices.

**C.**    **Plaintiff and the Class are Injured by Samsonite's Deceptive Pricing Scheme**

40.    The "OUR PRICE" prices listed and advertised on Defendant's outlet products are fake reference prices, utilized only to perpetuate Defendant's fake-discount scheme.  Samsonite's deceptive reference prices artificially inflated consumer demand, such that each consumer who purchased a falsely discounted product paid higher prices when compared to the prices they would have paid in the absence of the false purported discount.[20]

41.    Defendant knows that its comparative price advertising is false, deceptive, mislead, and unlawful under California and federal law.

42.    At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

43.    Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the Class to purchase merchandise in its outlet stores.

44.    Plaintiff relied upon Defendant's artificially inflated "OUR PRICE" prices and false discounts when purchasing the Suitcase from Defendant.  Plaintiff would not have made the purchase but for Defendant's representations regarding the false and inflated reference price "OUR PRICE" and the corresponding falsely discounted sales price of the Suitcase.

45.    Plaintiff and the Class reasonably and justifiably acted and relied on the substantial price differences that Defendant advertised, and made purchases believing that they were receiving a substantial discount on an item of greater value than it actually was.

---

[20] *See* Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 46.

Plaintiff, like other Class members, was lured in, relied on, and was damaged by these pricing schemes that Defendant carried out.

46.     Plaintiff was damaged in her purchase because Defendant's false reference price discounting scheme inflated the true market value of the item she purchased. Plaintiff was misled into believing that she was receiving substantial savings on the Suitcase she purchased from Samsonite, which was implied by the false advertised reference price.

47.     Plaintiff is susceptible to this reoccurring harm because she cannot be certain that Samsonite has corrected its deceptive pricing scheme and she desires to shop at Samsonite outlets in the future and would like to again purchase Samsonite outlet luggage.  However, she currently cannot trust that Defendant will label such merchandise with truthful price information in compliance with California law.  Given the surreptitious nature of Defendant's false discount pricing scheme, Plaintiff cannot know whether Defendant's purported "OUR PRICE" represents a bona fide former price or a false reference price, or whether Defendant's claim that the "NOW" price represents a significant discount is true or false.  Without corrective action, Plaintiff cannot be sure whether Defendant's outlet pricing practices represent true bargains or sham markdowns utilized for the purpose of driving sales.  Plaintiff simply does not have the resources to ensure that Defendant is complying with California and federal law with respect to its pricing practices.

## CLASS ALLEGATIONS

48.     Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant for violations of California state laws:

> All persons, within the State of California, from February 27, 2015, through the present (the "Class Period"), who purchased one or more products at a discount from the advertised "OUR PRICE" price from a Samsonite outlet store and who have not received a refund or credit for their purchase(s).

49.     Excluded from the Class is Defendant, as well as its officers, employees, agents, or affiliates, and any judge who presides over this action, as well as all past and present employees, officers, and directors of Samsonite.  Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with her motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

50.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable.  Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiff.

51.     ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a.      whether, during the Class Period, Samsonite used false "OUR PRICE" prices and falsely advertised price discounts on merchandise it sold in outlet stores;

b.      whether, during the Class Period, the "OUR PRICE" prices advertised by Defendant were the prevailing market prices for the respective merchandise during the three-month period preceding the dissemination and/or publication of the advertised former prices;

c.      whether Defendant's alleged conduct constitutes violations of the laws asserted;

d.      whether Defendant engaged in unfair and/or unlawful business practices under the laws asserted;

e.      whether Defendant engaged in false or misleading advertising;

f.      whether Plaintiff and the Class are entitled to damages and/or restitution and the proper measure of that loss; and

g.      whether an injunction is necessary to prevent Samsonite from continuing to use false, misleading and/or illegal price comparisons.

52.     *Typicality*: Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia,* all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

53.     *Adequacy*: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no antagonistic or adverse interest to those of the Class.

54.     *Superiority*: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to her and the Class for the wrongs alleged.  The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Absent the class action, Class members would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its unfair and unlawful misdeeds and continue in its unlawful practice to the detriment of the Class and general public.

55.     All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former "OUR PRICE" prices represented former market prices and that those "OUR PRICE" prices advertised prices that were actually in existence during the relevant time.  Due to the scope and extent of Defendant's consistent false "discount" price advertising scheme, disseminated in a years-long continuous campaign to California consumers via a number

of different platforms—in-store displays, media advertisements, print advertisements, etc.—it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class.  In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise from Defendant's California outlet stores.

56.    Defendant keeps extensive computerized records of its customers through, *inter alia*, customer loyalty programs and/or general marketing programs.  Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of Unfair Competition Law
### Business and Professions Code § 17200, et seq.

57.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

58.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. & Prof. Code § 17200.

59.    The UCL imposes strict liability.  Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful or unfair business practices—only that such practices occurred.

### *"Unfair" Prong*

60.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the

reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

61.     Defendant's actions constitute "unfair" business acts of practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false "OUR PRICE" prices and discounted "NOW" prices that were nothing more than fabricated reference prices leading to phantom markdowns, which did not represent any real savings because the reference prices did not represent *bona fide* former prices and Defendant failed to disclose to consumers what such advertised references meant such that the promised discount and/or savings represented was false, misleading and deceptive.   Defendant's acts and practices offended an established public policy of transparency in pricing, and Defendant has engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumer through the wrongful conduct alleged herein.

62.     The harm to Plaintiff and Class members outweighs the utility, if any, of Defendant's practices, which, as discussed above, can only be intended as a means of driving sales and increasing profits.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misleading and deceptive conduct described herein.

### *"Fraudulent" Prong*

63.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

64.     Defendant's acts and practices alleged above constitute fraudulent business practices as they have deceived Plaintiff and are highly likely to deceive members of the consuming public.   Plaintiff relied on Defendant's fraudulent and deceptive representations regarding its "OUR PRICE" prices and the corresponding discounts for merchandise Defendant sells at its outlet stores.   These misrepresentations played a substantial role in Plaintiff's decision, and those of the proposed Class, to purchase

products from Defendant's outlet stores, and Plaintiff would not have purchased the Suitcase absent Defendant's misrepresentations.

*"Unlawful" Prong*

65.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

66.    Samsonite's acts and practices alleged above constitute unlawful business acts or practices, as it has violated state and federal law in connection with its deceptive pricing scheme.   The Federal Trade Commission Act ("FCTA") prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements.  15 U.S.C. § 52(a).  Under the FTCA, false former pricing schemes similar to the ones implemented by Defendant, are described as deceptive practices that violate the FTCA:

> (a)    One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article.  If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison.  Where the former price is genuine, the bargain being advertised is a true one.  If, on the other hand, the former price being advertised is not bona fide but fictitious—***for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one***; the purchaser is not receiving the unusual value he expects.  In such a case, the "reduced" price is, in reality, probably just the seller's regular price.
>
> (b)    A former price is not necessarily fictitious merely because no sales at the advertised price were made.  The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly, and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

67.    In addition to federal law, California law also expressly prohibits false former pricing schemes.  California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price,*" states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the

offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

(Emphasis added).

68.     As detailed in Plaintiff's Third Cause of Action below, the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(9) prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

69.     The violation of any law constitutes an "unlawful" business practice under the UCL.

70.     As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

71.     Samsonite's practices, as set forth above, have misled Plaintiff, the proposed Class, and the public in the past and will continue to mislead in the future.  Consequently, Samsonite's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

72.     Samsonite's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that members of the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "OUR PRICE" prices and fictitiously discounted "NOW" prices that create phantom markdowns and financially harm consumers like Plaintiff and the Class.

73.     Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief ordering Samsonite to cease this unfair competition, as well as disgorgement and restitution to Plaintiff and the Class of all Samsonite's revenues

associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION

**Violation of the California False Advertising Law,**
**Business and Professions Code § 17500, *et seq.***

74.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

75.     Cal. Bus. & Prof. Code § 17500 provides:

[i]t is unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement … which is ***untrue*** or ***misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading …"

(Emphasis added).

76.     The "intent" required by Cal. Bus. & Prof. Code § 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

77.     Similarly, and as expressed above, Cal. Bus. & Prof. Code § 17501 provides:

no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

78.     Defendant's routine of advertising and publishing "OUR PRICE" prices on merchandise sold in its California outlets, which were never the true prevailing prices, was an unfair, untrue, and misleading practice.  This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were, and, therefore, lead to the false impression that the merchandise was worth more than it actually was.

79.    Defendant misled consumers by making untrue and misleading statements and failing to disclose what is required as stated in the Code, as alleged above.

80.    As a direct and proximate result of Defendant's misleading and false advertisements, Plaintiff and Class members have suffered injury in fact and have lost money.  As such, Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and all Class members, and to enjoin Defendant from continuing the unfair practices alleged herein.  Otherwise, Plaintiff, Class members, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

### THIRD CAUSE OF ACTION

**Violation of the Consumer Legal Remedies Act ("CLRA"),
California Civil Code § 1750, *et seq.***

81.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

82.    This cause of action is brought pursuant to the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.  Plaintiff and each member of the proposed Class are "consumers" as defined by Cal. Civ. Code § 1761(d).  Defendant's sale of merchandise to Plaintiff and the Class at its California outlet stores are "transactions" within the meaning of Cal. Civ. Code § 1761(e).  The products purchased by Plaintiff and the Class are "goods" within the meaning of Cal. Civ. Code § 1761(a).

83.    Defendant violated, and continues to violate, the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff and the Class which were intended to result in, and did result in, the sale of merchandise:

a.    representing that its merchandise has characteristics, uses, and/or benefits, which it does not (Cal. Civ. Code § 1770(a)(5));

b.    advertising goods or services with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)); and

c.    making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions (Cal. Civ. Code § 1770(a)(13)).

84.     Pursuant to § 1782(a) of the CLRA, on February 27, 2019, Plaintiff's counsel notified Defendant in writing by certified mail of the particular violations of § 1770(a) of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act.

85.     Defendant failed to respond appropriately to Plaintiff's letter, and did not agree to rectify the problems associated with the actions detailed above or agree to give notice to all affected consumers within 30 days of the date of written notice, as prescribed by Cal. Civ. Code § 1782.   Therefore, Plaintiff seeks actual, punitive and statutory damages in addition to injunctive relief, as appropriate under the CLRA, against Defendant on behalf of herself and the Class.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

A.     an Order certifying the Class, and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

B.     awarding Plaintiff and the proposed Class members all applicable actual, statutory and/or punitive damages, as warranted;

C.     awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

D.     awarding declaratory relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money Defendant is required to pay;

E.     order Defendant to engage in a corrective advertising campaign;

F.     awarding attorneys' fees and costs; and

G.     for such other and further relief as the Court may deem necessary or appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial for all of the claims so triable.

Respectfully submitted,

Dated: March 16, 2020

**CARLSON LYNCH, LLP**

By: _/s/ Todd. D. Carpenter_

Todd D. Carpenter (CA 234464)
Scott G. Braden (CA 305051)
1350 Columbia St., Ste. 603
San Diego, California 92101
Telephone: (619) 762-1900
Facsimile: (619) 756-6990
tcarpenter@carlsonlynch.com
sbraden@carlsonlynch.com

_Attorneys for Plaintiff and
Proposed Class Counsel_